# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## DURHAM DIVISION
## CIVIL ACTION NO.:  25-cv-999

|  |  |
|---|---|
| WOLFSPEED, INC.,<br><br>       **Plaintiff,**<br><br>   **vs.**<br><br>AIR PRODUCTS AND CHEMICALS, INC.,<br><br>      **Defendant.** | **COMPLAINT** |

The plaintiff Wolfspeed, Inc., f/k/a Cree, Inc. ("Wolfspeed"), complaining of the defendant Air Products and Chemicals, Inc. ("Air Products"), alleges and says:

## PARTIES, JURISDICTION, AND VENUE

1. Wolfspeed is a Delaware corporation with its principal place of business in Durham County, North Carolina.

2. Wolfspeed is a market-leading innovator in the field of semiconductor materials.

3. Upon information and belief, Air Products is a Pennsylvania corporation with its principal place of business in Allentown, Pennsylvania.

4. Upon information and belief, Air Products provides natural gas supply solutions to clients domestically and internationally.

5. There is complete diversity of citizenship between Wolfspeed and Air Products.

6. The amount in controversy exceeds $75,000.00.

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

8.　　　This Court has personal jurisdiction over Air Products because of (i) its continuous and substantial contacts with the state of North Carolina in the ordinary course of its business and (ii) its specific transactions with Wolfspeed.

9.　　　Venue is proper in the Durham division of the United States District Court for the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this matter occurred in this District. Specifically, Wolfspeed negotiated and executed the parties' agreement in Durham.

## FACTS

### Air Products Agrees to Provide Wolfspeed's Requirements for Bulk Gas Products

10.　　　In 2023, Wolfspeed sought a supplier for certain bulk gases it needed for the manufacturing operations it planned to conduct at a recently purchased semiconductor manufacturing facility in Farmers Branch, Texas (the "Designated Location"), where Wolfspeed planned to produce 150 mm epitaxy wafers. Prior to purchasing the Designated Location, while the Designated Location was operational, and at all times since the Designated Location has ceased operations, the only other location where Wolfspeed has produced 150 mm epitaxy wafers is Wolfspeed's main site in Durham, North Carolina (the "Main Site").

11.　　　On October 18, 2023, Wolfspeed and Air Products entered into an agreement for Wolfspeed to purchase its requirements of certain bulk gas products from Air Products for use at the Designated Location in connection with Wolfspeed's production of 150 mm epitaxy wafers (the "Agreement"). A copy of the agreement will be provided upon entry into a mutually agreeable protective order.

12. Under the Agreement, Air Products agreed to supply and deliver to the Designated Location hydrogen, nitrogen, oxygen, and argon gases meeting certain agreed specifications in bulk quantities (collectively, the "Products").

13. Air Products also promised to provide and install, where applicable, equipment necessary to store the Products at the Designated Location and to deliver the Products to the point of tie-in to Wolfspeed's process piping (collectively, the "Air Products Equipment") and to maintain said equipment in good repair and working order. Under the terms of the Agreement, Air Products provided and installed, where applicable, the Air Products Equipment at the Designated Location.

14. At all relevant times, Wolfspeed performed its obligations under the Agreement. In pertinent part, as of the date of this Complaint, Wolfspeed has paid Air Products' undisputed invoices that have become due and payable.

**Air Products Refuses to Remove Production Equipment**

15. In or about December 2024, Wolfspeed ceased operations at the Designated Location due to an abrupt and permanent decline in demand for the 150 mm epitaxy wafers produced at the Designated Location.

16. Because of the cessation of operations at the Designated Location, Wolfspeed no longer had requirements for the Products other than a reduced need for nitrogen to operate and maintain a piece of facilities equipment pending disposition of that equipment.

17. At no time prior to or after Wolfspeed ceased operations at the Designated Location has Wolfspeed relocated, in whole or in part, to a new location(s) any of Wolfspeed's activities that used the Products *and* were performed at the Designated Location.

18. Wolfspeed's 150 mm epitaxy wafer production and related bulk gas consumption at the Main Site has not increased—and has actually decreased—since Wolfspeed ceased operations at the Designated Location.

19. Wolfspeed did not offer any of the employees who were employed at the Designated Location a transfer to any other Wolfspeed facilities, with the sole exception of a small number of employees who had relocated from Durham, North Carolina to assist with the Designated Location opening operations and were given the opportunity to return to their previous positions at the Main Site.

20. Following the Designated Location's closure, Wolfspeed moved 57 out of the 59 individual pieces of production equipment used at the Designated Location to storage locations in North Carolina and New York.

21. The two production tools from the Designated Location that were not put into storage were instead moved to a Wolfspeed semiconductor manufacturing facility in Siler City, North Carolina, that does not make 150 mm epitaxy wafers. These two tools are used to clean parts from other tools and are not used to process epitaxy wafers.

22. Pursuant to Section 6 of Rider 1 Merchant Supply, Attachment II of the Agreement, discontinuation of Wolfspeed's Product requirements triggers the removal of unnecessary equipment, the reimbursement by Wolfspeed of certain removal and unamortized installation costs and expenses, and the cessation of the monthly service charges (which are actually monthly rental fees) for the removed equipment. Section 6 of Attachment II further provides that the Agreement will remain in effect after discontinuation of Wolfspeed's requirements for a Product and removal of the related Air Products Equipment, and if Wolfspeed's requirements for the Product at the Designated Location resume during the term, then appropriate equipment will be reinstalled and

commissioned by Air Products, and Wolfspeed will resume purchasing the Product from Air Products and paying monthly service charges for the reinstalled equipment.

23. Section 1.2 in each of Attachments I-A, I-B, I-C, and I-D to Rider 1 Merchant Supply of the Agreement governs the availability of certain rights and related remedies of Air Products upon the happening of certain events and provides in relevant part:

> **Termination due to Discontinuation and Relocation.** This Attachment is applicable to all Buyer's activities that use the Products and are carried on at the Designated Location(s). In the event such Buyer's activities are, in whole or in part, discontinued and relocated to a new location(s) (including by consolidating such activities at existing Buyer location(s)), and after such relocation, Buyer's monthly requirements for the Products are less than 70% of the applicable Estimated Monthly Volume on average in previous rolling 3 month period, then the Seller will have an option to offer to supply, under the terms of this Agreement and this Rider, Buyer's Product requirements for the relocated activities at the new location(s) for a new initial Term, but if Buyer declines, fails to respond to, or otherwise does not provide an acceptance of, the offer, then Seller may terminate this Rider by providing Buyer ninety (90) days' prior written notice, and Buyer shall pay Seller the applicable termination payment amount in accordance with the table below on the date of such termination.

24. Section 1.2 in Attachments I-A, I-B, I-C, and I-D therefore contemplates that Air Products can receive a termination payment in the instance of Wolfspeed's discontinuation of activities that used the Products and were carried on at the Designated Location *and the relocation* of said activities from the Designated Location to a new location(s), if Air Products provided Wolfspeed an offer to supply Products for the relocated activities at the new location(s) and Wolfspeed did not accept such offer.

25. In the fall of 2024, Wolfspeed notified Air Products of its plans to cease operations at the Designated Location.

26. On December 18, 2024, Air Products sent Wolfspeed an offer to provide gas products at unnamed locations in North Carolina, operating under the erroneous assumption that

Wolfspeed relocated its manufacturing operations carried on at the Designated Location to another facility in North Carolina.

27. Wolfspeed promptly rejected the offer in writing, as Wolfspeed had not relocated the manufacturing operations carried on at the Designated Location to any other facility, which was clearly explained to Air Products.

28. After receiving notice that Wolfspeed would be ceasing operations at the Designated Location in December 2024, Air Products scheduled removal of the Air Products Equipment beginning in January 2025, with all but the nitrogen bulk gas equipment to be fully removed by the end of March 2025. Wolfspeed requested to retain the Air Products Equipment associated with the storage and distribution of nitrogen, and to continue to receive reduced deliveries of nitrogen, to support the continued operation of a piece of facilities equipment until Wolfspeed disposed of that facilities equipment. Shortly after receiving Wolfspeed's letter rejecting its offer, Air Products cancelled the scheduled removal of the Air Products Equipment without further explanation.

29. Following such cancellation, senior management representatives for both parties met in person pursuant to the dispute resolution provisions in the Agreement to discuss the circumstances resulting in Wolfspeed's decision to close the Designated Location and to try to resolve the parties' differences. In connection with such discussion, among other things, Air Products informed Wolfspeed that the removal costs and unamortized installation costs and expenses for the Air Products Equipment to be removed totaled $200,000. Air Products subsequently issued a corresponding invoice dated June 6, 2025.

30. In reliance on Air Products' forthcoming removal of its equipment, Wolfspeed paid Air Products the invoiced $200,000, which payment Air Products accepted. Under the Agreement,

payment of the $200,000 removal fee and unamortized installation costs and expenses also terminated Wolfspeed's obligation to pay monthly service charges associated with the Air Products Equipment.

31.     To date, Air Products has not removed the Air Products Equipment from the Designated Location and contends that Wolfspeed has no right to request that the Air Products Equipment be removed and that Wolfspeed remains obligated to pay ongoing monthly service charges for the Air Products Equipment for the remainder of the term of the Agreement, which obligation Wolfspeed disputes. Nonetheless, Wolfspeed has continued to pay the monthly service charges while seeking an amicable resolution with Air Products.

32.     Despite the fact that Wolfspeed did not relocate any of its manufacturing operations from the Designated Location to any other facility, on June 28, 2025, Air Products sent Wolfspeed a notice terminating the Agreement effective September 26, 2025, and demanding payment of the termination fee.

## CLAIM FOR RELIEF I
### (DECLARATORY JUDGMENT – No Relocation of Activities)

33.     Wolfspeed realleges the allegations of all prior paragraphs above and incorporates them by reference.

34.     A dispute has arisen over Air Products' contention that Wolfspeed relocated its manufacturing operations from the Designated Location to other facilities and therefore is required to pay Air Products a termination fee.

35.     When it ceased operations at the Designated Location due to reduced demand for 150 mm epitaxy wafers, Wolfspeed did not relocate any manufacturing operations to any other facility.

36. Nevertheless, Air Products contends that: (i) Wolfspeed relocated its manufacturing operations away from the Designated Location; (ii) Air Products made an offer to supply the Products to other facilities as contemplated by the Agreement; and (iii) Wolfspeed declined that offer and must therefore pay a termination fee.

37. By reason of the foregoing, an actual and justiciable controversy exists between the parties.

38. Wolfspeed requests that declaratory relief be granted declaring that Air Products has no right to supply Products to Wolfspeed's ongoing or preexisting operations at other facilities and that Wolfspeed need not pay any termination fee because Wolfspeed did not relocate its manufacturing operations from the Designated Location to any other facility.

**CLAIM FOR RELIEF II**
**(DECLARATORY JUDGMENT – Obligation to Remove Air Products Equipment)**

39. Wolfspeed realleges the allegations of all prior paragraphs above and incorporates them by reference.

40. A dispute has arisen over Air Products' obligation to remove the Air Products Equipment from the Designated Location and the cessation of the monthly service charges (also known as monthly rental fees) for said equipment.

41. Pursuant to Section 6 of Attachment II to Rider 1 Merchant Supply of the Agreement, if Wolfspeed's requirements for a Product cease, Air Products Equipment associated with that Product must be removed by Air Products.

42. Nevertheless, Air Products contends that it has no obligation to remove any of the Air Products Equipment from the Designated Location and that, to the contrary, Wolfspeed must continue to pay Air Products the monthly service charges for the Air Products Equipment for the remainder of the term of the Agreement.

43. By reason of the foregoing, an actual and justiciable controversy exists between the parties.

44. Wolfspeed requests that declaratory relief be granted declaring that Air Products must remove the Air Products Equipment following the cessation of Wolfspeed's requirements pursuant to Section 6 of Attachment II of the Agreement.

45. Wolfspeed further requests that declaratory relief be granted declaring that Wolfspeed has no obligation to pay ongoing monthly service charges in connection with the Air Products Equipment subsequent to and effective as of the date of its payment of the $200,000 invoiced by Air Products for the removal costs and unamortized installation costs and expenses and that all payments for monthly service charges made by Wolfspeed after the $200,000 payment was accepted by Air Products must be returned to Wolfspeed, with interest to the extent permitted by applicable law.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Wolfspeed respectfully requests that this Court enter judgment in its favor and against Air Products as follows:

A. Declaring that Wolfspeed did not relocate any portion of its manufacturing operations from the Designated Location to any other facility and therefore has no obligation to remit any termination fee to Air Products under the Agreement and that Air Products has no right to supply Wolfspeed's ongoing or preexisting operations at any other facility;

B. Declaring that Air Products remove the Production Equipment from the Designated Location;

C.        Declaring that Wolfspeed has no obligation to pay ongoing monthly service charges in connection with the Production Equipment subsequent to and effective as of the date it paid the $200,000 invoiced by Air Products for the removal costs and unamortized installation costs and expenses and ordering Air Products to return to Wolfspeed all monthly service charges paid by Wolfspeed after the $200,000 payment was accepted by Air Products, with interest to the extent permitted by applicable law;

D.        Ordering Air Products to pay all attorneys' fees and costs that Wolfspeed incurred in bringing this action; and

F.        Awarding Wolfspeed all further relief that the Court deems just and appropriate.

This the 31st day of October, 2025.

                */s/ Rebecca K. Lindahl*     .
                Rebecca K. Lindahl
                N.C. Bar No. 35378
                rebecca.lindahl@katten.com
                Michaela Holcombe
                N.C. Bar No. 50780
                michaela.holcombe@katten.com
                *Attorneys for Wolfspeed, Inc.*

**OF COUNSEL:**

**KATTEN MUCHIN ROSENMAN LLP**
615 S. College Street
Suite 1700
Charlotte, NC 28202-4213
Telephone: 704.444.2000
Facsimile: 704.444.2050